UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CHRISTOPHER MICHAEL TAYLOR,

                    Petitioner,

                                            Case No. 1:20-cv-1233

v.

                                              Hon. Hala Y. Jarbou

ERICA HUSS,

                    Respondent.

_____/

## OPINION

       This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Christopher Michael Taylor is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility in Carson City, Michigan. On April 16, 2015, in the Calhoun County Circuit Court, Petitioner was convicted of first-degree murder, in violation of Mich. Comp. Laws § 750.316, felon in possession of a firearm, in violation of Mich. Comp. Laws § 750.224f, and two counts of use of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b. On June 8, 2015, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to life imprisonment without the possibility of parole to be served concurrently with a sentence of 6 years, 4 months to 25 years for felon-in-possession. Those sentences, in turn, were to be served consecutively to concurrent 2-year terms of imprisonment for the felony-firearm convictions. Petitioner contends that he is held in custody pursuant to these sentences in violation of his constitutional rights.

## I.      Factual Allegations and Procedural History

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as

follows:

In the early morning hours of November 9, 2014, Xavier Embry was fatally shot as he sat in his car near 263 Parkway in Battle Creek. Two eyewitnesses testified at trial to what they saw. John Obyrne testified that his home was approximately 30 to 40 feet from where Embry was shot. He said that he woke up at approximately 3:20 a.m., and went to his enclosed front porch to smoke a cigarette. While on the porch smoking, he saw a man walk up to a parked white car, stand at an angle to the door, and reach an object that he held in his hand inside the vehicle. Obyrne then witnessed two "[t]wo loud pops and two flashes . . . inside the vehicle" that were consistent with gunshots. Afterward, he watched the man "walk[] back around the back side of the vehicle" and flee the scene through the yard of a nearby home. Obyrne said he was "positive" that the man was wearing "a sweat jacket-type of hoodie" that "had camo arms." Meosha Brown, who also witnessed the shooting as she sat in a nearby vehicle, provided testimony consistent with Obyrne's testimony. Although Brown could not tell the gender or race of the person who approached the white car prior to the sound of gunshots, she did see that the person had on "some Army fatigues print." Obyrne telephoned the police. When they arrived, he told them where he had last seen the suspect.

Officer Kevin Farnham, a canine handler with the Battle Creek Police Department (BCPD), testified that, starting from where Obyrne told police he had last seen the suspect, he along with BCPD Officer Mikael Ziegler and Bruiser, Farnham's tracking-dog, tracked the suspect to a house on 213 Howland. There, they found defendant sitting alone on the porch, wearing a jacket with camouflage on the sleeves. Obyrne testified that approximately 10 minutes after the shooting, police took him to a house and showed him defendant, who was standing in the front yard of the house with officers behind and on either side of him, wearing the same clothing as the man he had seen approach Embry's car. He confirmed to the police that defendant was the man he had seen shoot into the white car. Obyrne also made an in-court identification of defendant as the shooter.

BCPD Officer Jordan Barrons was dispatched to 213 Howland to secure the scene and look for evidence. He testified that he found a nine-millimeter Taurus handgun in the backyard of the house. Detective Todd Rathjen, a BCPD lab specialist and latent fingerprint identification and comparison expert, testified that a fully identifiable latent fingerprint found on the gun's magazine matched that of defendant's left index finger. Firearms and tool marks expert Jeffrey Amley testified that the undamaged bullet removed from Embry's body and a spent shell casing recovered from Embry's car came from the gun recovered at 213 Howland. BCPD Detective Scott Eager, an expert in extracting information from mobile

2

devices, testified that a photograph of a handgun found on defendant's cell phone
was consistent with the gun found at 213 Howland.

(Mich. Ct. App. Op., ECF No. 21-23, PageID.2866–2867.)

The jurors heard testimony from several witness during the three-day trial, including: the
forensic pathologist who conducted the autopsy on the victim; police officers who responded to
the initial call or participated in the investigation; an investigator from the medical examiner's
office; a woman who was parked on the street when the incident occurred; and a resident of a home
near where the incident occurred. (Trial Tr. I & II, ECF Nos. 21-4, 21-5.) Petitioner did not testify,
and he did not call any other witnesses. (Trial Tr. III, ECF No. 21-7, PageID.2366–2367, 2370.)
On the third day of trial, the jury heard closing arguments and instructions. (*See generally id.*) The
jury deliberated for less than an hour before returning a verdict of guilty on all charges. (*Id.*,
PageID.2405–2406.)

After Petitioner was sentenced, with the assistance of counsel, he directly appealed his
convictions. (Pet'r's App. Br., ECF No. 21-23, PageID.2876–2909.) By opinion issued June 29,
2017, the Michigan Court of Appeals affirmed the trial court. (Mich. Ct. App. Op., ECF No. 21-23,
PageID.2866–2870.) Petitioner then filed a *pro per* application for leave to appeal in the Michigan
Supreme Court. That Court denied leave by order entered March 5, 2018. (Order, ECF No. 21-26,
PageID.3402.)

On March 4, 2019, Petitioner filed a motion for relief from judgment in the trial court.[1]
(Mot. for Relief from J., ECF No. 21-15, PageID.2619–2622.) By order entered April 8, 2019, the
trial court denied relief because Petitioner had "demonstrated neither good cause nor actual

---

[1] This was not Petitioner's first motion for relief from judgment. The trial court permitted Petitioner
to withdraw his first motion for relief from judgment. (Calhoun Cnty. Cir. Ct. Order, ECF
No. 21-14, PageID.2618.)

prejudice as required by the court rule." (Calhoun Cnty. Cir. Ct. Order, ECF No. 21-18, PageID.2722–2723.) Petitioner filed a *pro per* application for leave to appeal in the Michigan Court of Appeals. (Pet'r's Appl. for Leave to Appeal, ECF No. 21-24, PageID.3127–3146.) That court denied leave by order entered January 7, 2020. (Mich. Ct. App. Order, ECF No. 21-24, PageID.3126.) Petitioner then filed a *pro per* application for leave to appeal in the Michigan Supreme Court. (Pet'r's Appl. for Leave to Appeal, ECF No. 21-27, PageID.3432–3477.) Thereafter, counsel appeared on Petitioner's behalf, the same counsel that represents Petitioner in this Court. *See* https://www.courts.michigan.gov/c/courts/coa/case/350643 (last visited Sept. 3, 2024). Counsel sought leave to add additional issues to the application. (Pet'r's Mot. to Add Issues, ECF No. 21-17, PageID.3507–3520.) The Michigan Supreme Court granted that relief, but denied leave to appeal on October 27, 2020. (Mich. Order, ECF No. 21-27, PageID.3431.)

Thereafter, on December 22, 2020, Petitioner, with the assistance of counsel, timely filed his habeas petition raising thirteen grounds for relief, as follows:

I.      Petitioner was denied his right to effective assistance of counsel . . . by trial counsel's failure to present evidence that Petitioner and the decedent were well acquainted, when the decedent's dying words were that he did not know his attacker.

II.     Petitioner's rights to due process . . . and effective assistance of counsel . . . were violated by trial counsel's failure to object to a suggestive and tainted in-court identification by John Obyrne and request exclusion of the identification.

III.    Trial counsel was ineffective for failing to challenge 2 biased jurors.

IV.     The prosecutor argued facts not in evidence, in violation of Petitioner's due process right to a fair trial.

V.      Trial counsel was ineffective for advising Petitioner not to testify and by failing to interview, investigate, or produce witnesses Richard Young and Jerry Morris.

4

VI.     Trial counsel's complete failure to investigate and engage in routine preparation resulted in the constructive absence of counsel, warranting a presumption of prejudice.

VII.    The trial court denied defendant's request for an adjournment based on the prosecution's last-minute production of discovery, denying defendant a reasonable opportunity to examine and investigate the documents and therefore to present a complete defense, in violation of due process.

VIII.   The prosecutor committed misconduct by using Petitioner's silence against him, in violation of due process.

IX.     Trial counsel was ineffective in failing to ensure that the jury was properly instructed on multiple critical areas of the law.

X.      Appellate counsel was ineffective in failing to raise the instant claims on the appeal as of right.

XI.     The evidence of premeditation and deliberation is insufficient to sustain the conviction under the Due Process Clause of the Fourteenth Amendment.

XII.    Trial counsel was ineffective in failing to object to the prosecutor's comments on Petitioner's post-arrest, po[s]t-*Miranda* silence.

XIII.   The cumulative errors in defendant's trial deprived him of a fair trial.

(Pet., ECF No. 1, PageID.7-28, 37–49.)[2]

Matching Petitioner's habeas grounds to this procedural history reveals that habeas grounds I and II were raised on direct appeal, habeas grounds III–X were raised in Petitioner's motion for relief from judgment, and habeas grounds XI–XIII were the "additional issues" raised in Petitioner's application for leave to appeal to the Michigan Supreme Court regarding the denial of Petitioner's motion for relief from judgment. (First Am. Pet., ECF No. 9, PageID.1155–1157.) The

---

[2] Petitioner's initial petition presents his grounds twice, once on the court-approved form and a second time on attached pages. The two presentations are not identical. Generally, the first presentation provides less detail than the second. For that reason, with one exception, the statement of grounds represented here is taken from the attached pages, not the court-approved form. With regard to habeas grounds III and IV, however, the attached pages present the same ground twice. On the court-approved form, they are not the same. Habeas ground III in the list above is taken from the court-approved form.

Court granted Petitioner leave to file an amended petition on February 26, 2021. The habeas grounds in the amended petition are as follows:

I.      Petitioner was denied his right to effective assistance of counsel . . . by trial counsel's failure to present evidence that Petitioner and the decedent were well acquainted, when the decedent's dying words were that he did not know his attacker.

II.      Petitioner's rights to due process . . . and effective assistance of counsel . . . were violated by trial counsel's failure to object to a suggestive and tainted in-court identification by John Obyrne and request exclusion of the identification.

III.      Trial counsel was ineffective for failing to challenge **two** biased jurors, **violating Petitioner's Sixth and Fourteenth Amendment rights to an impartial jury**.

IV.      The prosecutor argued facts not in evidence, in violation of Petitioner's due process right to a fair trial.

V.      Trial counsel was ineffective for advising Petitioner not to testify and by failing to interview, investigate, or produce witness~~es Richard Young and~~ Jerry Morris.

VI.      Trial counsel's complete failure to investigate and engage in routine preparation resulted in the constructive absence of counsel, warranting a presumption of prejudice.

VII.      The trial court denied defendant's request for an adjournment based on the prosecution's last-minute production of discovery, denying defendant a reasonable opportunity to examine and investigate the documents and therefore to present a complete defense, in violation of due process.

VIII.      The prosecutor committed misconduct by using Petitioner's silence against him, in violation of due process.

IX.      Trial counsel was ineffective in failing to ensure that the jury was properly instructed on multiple critical areas of the law.

X.      Appellate counsel was ineffective in failing to raise the instant claims on the appeal as of right.

XI.      The evidence of premeditation and deliberation is insufficient to sustain the conviction under the Due Process Clause of the Fourteenth Amendment.

XII.      Trial counsel was ineffective in failing to object to the prosecutor's comments on Petitioner's post-arrest, po[s]t-*Miranda* silence.

XIII.   The cumulative errors in defendant's trial deprived him of a fair trial.

(Pet., ECF No. 1, PageID.37–49.)[3]

On May 6, 2021, Petitioner filed a motion to stay these proceedings and hold them in abeyance pending his exhaustion of new issues in the state court. (ECF No. 11.) Petitioner claimed that he had secured new evidence in the form of affidavits from several witnesses in support of a claim of self-defense. (*Id*.) The Court granted that relief and also advised Petitioner that returning to the state courts would afford him the opportunity to ensure that habeas grounds XI–XIII were exhausted by raising them at all levels of the state court system. (ECF No. 12.)

On May 28, 2021, Petitioner filed a motion for relief from judgment in the trial court. (ECF No. 21-22.) On September 21, 2021, the trial court denied relief. (Calhoun Cnty. Cir. Ct. Order, ECF No. 21-25, PageID.3274–3275.) The trial court concluded that Plaintiff's claim that trial counsel was ineffective for failing to present the new evidence of Petitioner's innocence was meritless because the Michigan Court of Appeals had already considered and rejected such a claim on a prior appeal and, thus, relief was not available under Mich. Ct. R. 6.508(D)(2). (*Id*., PageID.3274.) The trial court also determined that the evidence did not qualify as "newly discovered" and would not make "a different result probable on retrial." (*Id*., PageID.3275.)[4] Accordingly, the trial court denied Petitioner's motion.

---

[3] Petitioner also presented his habeas grounds in the first amended petition twice. This representation of the grounds is taken from the pages attached to the amended petition with changes from the initial petition listing indicated in bold and underlined.

[4] Under Michigan Court Rule 6.508, the trial court may not grant relief from judgment if the issue was decided against the defendant in a prior appeal. The only exceptions to that limit are as follows: "a court is not precluded from considering previously decided claims in the context of a new claim for relief, such as in determining whether new evidence would make a different result probable on retrial, or if the previously decided claims, when considered together with the new claim for relief, create a significant possibility of actual innocence . . . ." Mich. Ct. R. 6.508(D)(2).

Petitioner sought leave to appeal that denial, first in the Michigan Court of Appeals and then in the Michigan Supreme Court. Those courts denied leave by orders entered July 1, 2022, and November 30, 2022, respectively. (Mich. Ct. App. Order, ECF No. 21-25, PageID.3235; Mich. Order, ECF No. 21-25, PageID.3597.) Two weeks later, Petitioner moved to reopen this proceeding. (ECF No. 13.)

The Court granted Petitioner leave to file a second amended petition. (ECF No. 16.) To avoid the confusion that follows from juggling multiple petitions setting forth some, but not all, of the issues, the Court specifically directed Petitioner _**not**_ to file his proposed supplemental petition that incorporated a prior petition. (*Id*.) The Court directed Petitioner to file one petition that included all of the habeas grounds for relief and one supporting brief. (*Id*.) Petitioner did not follow the Court's direction. Petitioner's supplemental petition sets forth the following additional issues:

      XIV.   Petitioner had ineffective assistance of trial counsel.

      XV.    Petitioner had ineffective assistance of appellate counsel.

      XVI.   Petitioner is actually innocent.

(Suppl. Pet., ECF No. 17, PageID.1725–1726.)

Respondent filed a response along with the state court record. (ECF Nos. 20, 21.) Respondent contends that several of Petitioner's habeas grounds are procedurally defaulted[5] and

---

[5] Even if some of the grounds are unexhausted and procedurally defaulted, a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); 28 U.S.C. § 2254(b)(2)). Here, with regard to most of the issues that Respondent contends are procedurally defaulted, resolving the procedural default issue requires examining the merits to evaluate prejudice. For those issues, judicial economy favors proceeding directly to a discussion

that all of them lack merit. (ECF No. 20, PageID.1828–1831.) As set forth fully below, the Court concludes that habeas review of grounds XI–XIII is barred by the doctrine of procedural default. The rest of Petitioner's habeas grounds lack merit. Accordingly, the petition will be denied.

## II.      Exhaustion and Procedural Default (Habeas Grounds XI, XII, and XIII)

Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275–77 (1971); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court. *O'Sullivan*, 526 U.S. at 845; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009). "To satisfy the presentation requirement, the petitioner must have argued the claim's factual and legal basis at each level of the state court system." *Whitman v. Gray*, 103 F.4th 1235, 1238 (6th Cir. 2024) (citing *Wagner*, 581 F.3d at 414–15).

Petitioner bears the burden of showing exhaustion. *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Petitioner acknowledges that he raised these three issues only in the Michigan Supreme Court. (ECF No. 17-5, PageID.1771; *see also* Pet'r's Br., ECF No. 10, PageID 1549, 1555, 1557.)[6] Accordingly, Petitioner has not fairly presented the issues to the state courts.

---

of the merits of Petitioner's claims, rather than conducting a lengthy inquiry into exhaustion and procedural default. The Court will address Petitioner's procedural default arguments with regard to habeas grounds XI–XIII.

[6] Presentation of an issue for the first time on discretionary review to the state supreme court does not fulfill the requirement of "fair presentation." *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

It is possible that Petitioner's failure to fairly present habeas grounds XI–XIII would not

preclude the Court from granting relief on those grounds. As the Sixth Circuit explained in *Rust v.*

*Zent*:

> [Failure to e]xhaust[] is a problem only if the state still provides a remedy for the
> habeas petitioner to pursue, thus providing the state courts an opportunity to correct
> a constitutionally infirm state court conviction. If no remedy exists, and the
> substance of a claim has not been presented to the state courts, no exhaustion
> problem exists; rather, it is a problem of determining whether cause and prejudice
> exist to excuse the failure to present the claim in the state courts.

*Rust*, 17 F.3d at 160. Michigan provides one post-direct-appeal procedure for attacking convictions

or sentences: a motion for relief from judgment under Mich. Comp. Laws 6.500 *et seq.*[7] Under

Michigan law, one such motion may be filed after August 1, 1995. Mich. Ct. R. 6.502(G)(1).

Petitioner has already filed two, his second one being denied as successive. The Court concludes,

therefore, that Petitioner no longer has an available state court remedy.

When a petitioner has procedurally defaulted his claims, the federal habeas court will only

entertain the defaulted issue if the petitioner can show "cause" for the procedural default and

"actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman*

*v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Lucas v.*

---

Applying *Castille*, the Sixth Circuit has recognized that a habeas petitioner does not comply with
the exhaustion requirement when he fails to raise a claim in the state court of appeals but raises it
for the first time on discretionary appeal to the state's highest court. *See Hickey v. Hoffner*, 701 F.
App'x 422, 425 (6th Cir. 2017); *Skinner v. McLemore*, 425 F. App'x 491, 494 (6th Cir. 2011);
*Thompson v. Bell*, 580 F.3d 423, 438 (6th Cir. 2009); *Warlick v. Romanowski*, 367 F. App'x 634,
643 (6th Cir. 2010). Unless the state supreme court actually grants leave to appeal and reviews the
issue, it remains unexhausted in the state courts. Petitioner's application for leave to appeal was
denied, and, thus, the issue was not reviewed.

[7] *See, e.g.*, *People v. Kincade*, 522 N.W.2d 880, 882 (Mich. Ct. App. 1994) (stating "Defendant's
postappeal motions for a new trial . . .were reviewable only as motions for relief from judgment
pursuant to MCR 6.501 et seq"); *People v. Watroba*, 483 N.W.2d 441, 442 (Mich. Ct. App. 1992)
("Subchapter 6.500 of the Michigan Court Rules establishes the procedures for pursuing
postappeal relief from a criminal conviction. The subchapter is the exclusive means to challenge a
conviction in Michigan once a defendant has exhausted the normal appellate process.").

*O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999); *Rust*, 17 F.3d at 160–61. To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).[8] Petitioner has not attempted to explain his failure to raise the issues in his second motion for relief from judgment. He was certainly aware of the issues by virtue of: (1) having raised them in his prior application for leave to appeal to the Michigan Supreme Court; and (2) this Court specifically advising Petitioner of the opportunity to raise claims that he had not previously raised to all levels of the Michigan Court system by including them in his second motion for relief from judgment, (Order, ECF No 12, PageID.1260 n.3).[9]

---

[8] Factors that may establish cause include "'interference by officials,' attorney error rising to the level of ineffective assistance of counsel, and 'a showing that the factual or legal basis for a claim was not reasonably available.'" *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010) (citing *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004)).

[9] It is worth noting that the Michigan Supreme Court's denial of the application for leave to appeal these three issues would not have precluded the trial court's consideration of the issues under Mich. Ct. R. 6.508(D), which states "[t]he court may not grant relief to the defendant if the motion . . . alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter . . . ." In *People v. Shook*, No. 233346, 2002 WL 31379664 (Mich. Ct. App. Oct. 22, 2002), the Michigan Court of Appeals considered a parallel situation, resolving it as follows:

> Here, the trial court denied defendant's motion for relief from judgment because defendant alleged "grounds for relief which were decided against the defendant in a prior appeal or proceeding. . . ." MCR 6.508(D)(2). Defendant filed a motion in the Supreme Court to add the same issues raised in her motion for relief from judgment and the Supreme Court granted the motion. However, in the same order, the Supreme Court denied defendant's application for leave to appeal. As defendant correctly observes, a denial of leave to appeal by the Supreme Court, without explanation, is generally not considered a decision on the merits and is not precedentially binding. *People v. Phillips*, 227 Mich. App. 28, 35; 575 N.W.2d 784 (1998); MCR 7.321. Thus, the trial court erred to the extent that it denied defendant's motion based on the Supreme Court's denial of leave to appeal.

Petitioner might argue that his counsel rendered ineffective assistance by failing to include these issues in Petitioner's second motion for relief from judgment. But, "a petitioner cannot claim constitutionally ineffective assistance of counsel" in proceedings where "[t]here is no constitutional right to an attorney." *Coleman*, 501 U.S. at 752. There is no constitutional right to an attorney in Michigan's post-conviction proceeding. *See, e.g.*, *Hardaway v. Robin*son, 655 F.3d 445, 450 (6th Cir. 2011) (citing *People v. Walters*, 624 N.W.2d 922, 923–24 (Mich. 2001)). Under those circumstances, Petitioner "must bear the risk of attorney error that results in a procedural default." *Coleman*, 501 U.S. at 752–53 (internal quotation marks omitted). Thus, Petitioner has failed to show any factor "external to the defense" to establish cause for his failure to raise these three issues in the Michigan trial court or court of appeals. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Absent demonstration of cause and prejudice for his failure to exhaust these issues in the state courts, Petitioner may only avoid the procedural default bar by showing that he is actually innocent. In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court explained this exception to the procedural default bar as follows:

> Because Schlup has been unable to establish "cause and prejudice" sufficient to excuse his failure to present his evidence in support of his first federal petition, *see McCleskey v. Zant*, 499 U.S. 467, 493–494, 111 S.Ct. 1454, 1469–1470, 113 L.Ed.2d 517 (1991), Schlup may obtain review of his constitutional claims only if he falls within the "narrow class of cases . . . implicating a fundamental miscarriage of justice," *id*., at 494, 111 S.Ct., at 1470. Schlup's claim of innocence is offered only to bring him within this "narrow class of cases."

*Schlup*, 513 U.S. at 314–15 (footnote omitted).

---

*Shook*, 2002 WL 31379664, at *2. There is nothing in the Michigan Supreme Court's order that suggests the court's denial of leave to appeal constitutes a decision on the merits of these three issues.

"'[A]ctual innocence' means factual innocence." *Bousley v. United States*, 523 U.S. 614, 623 (1998). In order to make a showing of actual innocence under *Schlup*, a Petitioner must present new evidence showing that "it is more likely than not that no reasonable juror would have convicted [the petitioner.]" *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) (quoting S*chlup*, 513 U.S. at 327) (addressing actual innocence as an exception to procedural default).

Petitioner proposes establishing his actual innocence by demonstrating that he shot the decedent, Xavier Embry, in self-defense, a defense of justification. That approach, however, necessarily requires that Petitioner admit that he intentionally shot Mr. Embry. *See, e.g.*, *People v. Spears*, ___ N.W.3d ___, 2023 WL 3026944, at *10 (Mich. Ct. App. Apr. 20, 2023) (citing *People v. Dupree*, 788 N.W.2d 399,405 n.11 (Mich. 2010), for the proposition that "an affirmative defense such as self-defense 'admits the crime'").

The Sixth Circuit has consistently determined that defenses based on justification or excuse relate to legal innocence, not factual innocence. *See, e.g.*, *Fuller v. Morrison*, No. 21-2704, 2022 WL 2719644, at *2 (6th Cir. Mar. 25, 2022) (concluding that an attack on a conviction based on the petitioner's mental health diagnoses and their impact on intent did not amount to a claim of factual innocence); *Arellano v. Howard*, No. 21-1024, 2021 WL 5499487, at *4 (6th Cir. Aug. 23, 2021) (concluding that a petitioner's challenge to a conviction for shooting her husband under a claim of legal justification relates to "legal" innocence, not factual innocence); *Bushner v. Bracy*, 17-3553, 2017 WL 9480312, at *3 (6th Cir. Dec. 11, 2017) (concluding that a claim of self-defense—which is a claim of justification—"goes to [the petitioner's] legal, rather than factual, innocence"); *Stewart v. Harry*, 17-1494, 2017 WL 9249946, at *2 (6th Cir. Nov. 21, 2017) (concluding that it was beyond debate that a claim of innocence based on self-defense is a claim of legal innocence, not factual innocence); *Bacon v. Klee*, No. 15-2491, 2016 WL 7009108, at *8

13

(6th Cir. Nov. 30, 2016) (same); *Harvey v. Jones*, 179 F. App'x 294, 298–99 (6th Cir. 2006) (concluding that the petitioner's claim of justification rested upon legal innocence, not factual innocence and citing cases). Petitioner's claim that he is innocent because he shot Mr. Embry in self-defense, therefore, even if true, cannot establish the "actual innocence" contemplated by *Schlup*. Therefore, this Court's review of habeas grounds XI–XIII is barred by Petitioner's procedural default.

## III.   AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000);

*Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011)

(en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## IV.   Discussion

### A.   Actual Innocence (Habeas Ground XVI)

In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred

constitutional claim considered on the merits." *Id*. at 315 (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

In *Herrera*, the Supreme Court determined that there is no federally cognizable stand-alone actual innocence claim. 506 U.S. at 400 (holding that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding"). But the *Herrera* Court did not close the door completely, stating in dicta: "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id*. at 417.[10] Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id*. The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id*.; *see also House v. Bell*, 547 U.S. 518, 555 (2006) ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

This is not a capital case. The *Herrera* exception does not apply. Petitioner's claim of actual innocence is not cognizable on habeas review.

---

[10] The Supreme Court creates exceptions for capital cases "because of the qualitative difference between death and all other penalties[,]" including "mandatory life in prison without parole." *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991).

17

**B.**   **Counsel Failed to Present Evidence that Mr. Embry and Petitioner Knew Each Other (Habeas Ground I)**

Petitioner contends that trial counsel rendered ineffective assistance because he failed to introduce evidence that Petitioner and Mr. Embry knew each other. That evidence, Petitioner claims, would have exculpated him.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v.*

18

*Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA; it requires the petitioner not only to demonstrate the merit of his underlying *Strickland* claim, but also to demonstrate that 'there is no possibility fairminded jurists could disagree that the state court's decision [rejecting the *Strickland* claim] conflicts with this Court's precedents'" (quoting *Harrington*, 562 U.S. at 102)).

The Michigan Court of Appeals evaluated Petitioner's ineffective assistance claim under the following standard:

> The right to counsel guaranteed by the United States and Michigan Constitutions, U.S. Const, Am. VI; Const. 1963, art. 1, § 20, entails the right to effective assistance of counsel. *People v. Vaughn*, 491 Mich. 642, 669; 821 N.W.2d 288 (2012). To establish ineffective assistance of counsel, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich. at 51. Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *Vaughn*, 491 Mich at 670.

(Mich. Ct. App. Op., ECF No. 21-23, PageID.2868.) Although the court of appeals cited state authority, the standard applied is identical to that set forth in *Strickland*. Indeed, *Trakhtenberg* identifies *Strickland* as the source of the standard. *People v. Trakhtenberg*, 826 N.W.2d 136, 143 (Mich. 2012).

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests

that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Because the Michigan Court of Appeals applied the correct standard, Petitioner can only overcome the deference afforded state court decisions if the court of appeals' conclusion regarding Petitioner's ineffective assistance claim is an unreasonable application of *Strickland* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d). As explained below, Petitioner fails to carry his burden with regard to the reasonableness of the court of appeals' determination of the facts or the reasonableness of the court's application of *Strickland*.

### 1.     The Michigan Court of Appeals' Determination of the Facts Was Reasonable

Petitioner's claim that his acquaintance with Embry was exculpatory is based on a strained reading of Mr. Embry's dying declaration to police. Officer Mikael Ziegler testified that he came

upon Mr. Embry's crashed vehicle a short distance from the location where the shooting occurred.
(Trial Tr. I, ECF No. 21-4, PageID.2104.) Mr. Embry was still alive, but he was "not moving and
in bad shape." (*Id.*) Officer Ziegler asked Mr. Embry what had happened and who had done this
to him. (*Id.*, PageID.2105.) Mr. Embry responded "that someone had come out of the woods and
shot him. . . . [and] he didn't know who it was." (*Id.*) Petitioner posits that because Mr. Embry
knew Petitioner, but did not know the shooter, the shooter could not have been Petitioner.

Petitioner's argument assumes that Mr. Embry's declaration meant that he got a good look
at the shooter but the shooter was unknown to Embry—that Embry did not recognize the shooter.
An equally valid interpretation of Mr. Embry's words would be that Mr. Embry never got a good
look at the shooter, so he did not know who it was. The Michigan Court of Appeals concluded that
Petitioner's interpretation was unsupported by the record:

> Defendant's argument on appeal assumes that Embry saw the person who shot him,
> and that, having seen his face, concluded that he did not know his assailant. This
> assumption finds no support in the record. On the contrary, Obyrne testified that
> the shooter approached Embry's car from the rear, stood at an angle to the car, and
> reached the hand holding the gun into the car. Testimony from the medical
> examiner established that one of the fatal bullets entered Embry's body "a little bit
> posterior on the [left] shoulder" and "came forward through the lung," while the
> other bullet entered "right on the back of the shoulder." The testimony of Obyrne
> and the medical examiner support the notion that the gunman positioned himself
> slightly behind Embry, making it unlikely that Embry saw the gunman's face.
> Embry's own words confirm that he did not see the gunman. Embry said that
> "someone" came out of the woods and he did not know who "it" was. Embry['s]
> statement indicates that he did not see the shooter well enough to detect whether
> the perpetrator was male or female.

(Mich. Ct. App. Op., ECF No. 21-23, PageID.2868.)

Those factual determinations—that Petitioner's interpretation of Embry's testimony has no
record support and that the other interpretation finds ample support in the record—are presumed
correct. *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (noting that "[t]he facts as recited by
the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C.

§ 2254(e)(1)"). Petitioner can overcome that presumption with clear and convincing evidence. He offers none. Instead he stands firm on the discredited interpretation. Petitioner argues "[w]ith his dying words, Embry told police that he saw his attacker approach but he did not know the man." (Pet'r's Br., ECF No. 10, PageID.1507.) Petitioner's stubborn insistence on that false premise does not constitute evidence to rebut the presumption (or record evidence) that the court of appeals' determinations are correct. Excising out Petitioner's false premise, his entire argument collapses.

### 2. The Michigan Court of Appeals Reasonably Applied *Strickland*

The Michigan Court of Appeals determined that, based on the record, "trial counsel [did not] render[] constitutionally ineffective assistance by failing to call [Petitioner's] relatives to testify to [Petitioner's] acquaintance with Embry." (Mich. Ct. App. Op., ECF No. 21-23, PageID.2868.) Moreover, the Court concluded that in light of "the substantial evidence linking [Petitioner] to the crime" there was no reasonable probability that calling Petitioner's proposed "acquaintance" witnesses would have led to a different trial outcome. (*Id.*, PageID.2869.) Thus, the court concluded that Petitioner had also failed to demonstrate prejudice.

The Michigan Court of Appeals reasonably applied *Strickland* in determining that Petitioner failed to show either *Strickland* prong. Petitioner's arguments to the contrary depend entirely on his flawed factual premise. Therefore, Petitioner has failed to show that the Michigan Court of Appeals' rejection of this ineffective assistance claim is contrary to, or an unreasonable application of, the clearly established law of *Strickland* and he is not entitled to habeas relief on this ground.

### C. Witness John Obyrne's In-Court Identification of Petitioner as the Shooter was Tainted by the "One-Man Show-Up" Identification the Night of the Shooting (Habeas Ground II)

Petitioner describes Witness Obyrne's in-court identification of Petitioner as "a lynchpin in the prosecution's case . . . ." (Pet'r's Appeal Br., ECF No. 21-23, PageID.2889.) That critical

identification, according to Petitioner, was tainted by the "blatantly suggestive" "police-orchestrated 'show-up' where Mr. Obyrne was shown only [Petitioner who] . . . was surrounded by police, with one on each side, and one behind him." (*Id.*) Petitioner contends that the trial court violated his due process rights by permitting the tainted in-court identification and counsel rendered ineffective assistance because he failed to challenge the identification.

Due process provides a "check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). As summarized in *Perry*, the Supreme Court has developed a two-part test for determining whether evidence gathered from an eyewitness identification must be excluded from trial due to the unduly suggestive nature of the identification procedure. *Id.* at 238–39 (citing *Neil v. Biggers*, 409 U.S. 188, 196 (1972); *Manson v. Brathwaite*, 432 U.S. 98, 107 (1997)). First, the *Perry* court stated that "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id.* Second, even when the police use such a procedure, suppression of the resulting identification is required only when, under the totality of the circumstances, the "improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 239 (quoting *Manson*, 432 U.S. at 116). The central concern in the second part of the inquiry is the reliability of the identification, and whether "the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion." *Id.* (quoting *Manson*, 432 U.S. at 114).

The Michigan Court of Appeals applied the following standard when evaluating Petitioner's claim:

> To challenge an identification on the basis of lack of due process, "'a defendant must show that the pretrial identification procedure was so suggestive in light of

the totality of the circumstances that it led to a substantial likelihood of misidentification.'" *People v. Williams,* 244 Mich. App. 533, 542; 624 N.W.2d 575 (2001), quoting *People v Kurylczyk*, 443 Mich. 289, 302; 505 N.W.2d 528 (1993) (opinion by GRIFFIN, J.).

(Mich. Ct. App. Op., ECF No. 21-23, PageID.2869.) Although the state appellate court relied on

state authority for a statement of the standard, the state authority cited—*Williams* and *Kurylczyk*—

rely on clearly established federal law: *Stovall v. Denno*, 388 U.S. 293 (1967) and *Biggers*, 409

U.S. at 196. *People v. Williams*, 624 N.W.2d 575, 580 (Mich. Ct. App. 2001); *People v. Kurylczyk*,

505 N.W.2d 528, 534 (Mich. Ct. App. 1993). The court of appeals' reliance on clearly established

federal law means that Petitioner cannot show that the court's decision was contrary to clearly

established federal law. *See supra* Section IV.B.

The court of appeals applied the standard and determined that the identification did not

violate Petitioner's due process rights:

An on-scene identification that occurs shortly after a crime "to obtain reliability in the apprehension of suspects" is not necessarily improper. *People v. Libbett*, 251 Mich. App. 353, 362; 650 N.W.2d 407 (2002). "Prompt, on-the-scene identifications are reasonable, 'indeed indispensable, police practices because they permit the police to immediately decide whether there is a reasonable likelihood that the suspect is connected with the crime and subject to arrest, or merely an unfortunate victim of circumstance.'" *Id.* at 359, quoting *People v. Winters*, 225 Mich. App. 718, 728; 571 N.W.2d 764 (1997). "[O]ne of the main benefits of prompt on-the-scene identifications," the Court explained, "is to obtain reliability in the apprehension of suspects, which insures both that the police have the actual perpetrator and that any improvidently detained individual can be immediately released." *Libbett*, 251 Mich. App. at 362.

In this case, having Obyrne identify defendant at the scene was consistent with the police need "to obtain reliability in the apprehension of suspects." *Id.* Obyrne saw the gunman's face and noticed the distinctive clothing he was wearing. Additionally, he told police where he had last seen the gunman, which allowed police to track the gunman to a house, where they found defendant sitting on the house's porch. Because Obyrne had seen the perpetrator commit the crime just 10 minutes earlier, the perpetrator's appearance was still fresh in Obyrne's mind. Identification of defendant as the man he had seen shoot Embry confirmed the reliability of the results of the tracking procedure and, thus, the police's apprehension of defendant. It is true that police were standing around defendant; but this is not incongruous behavior, considering that they had just detained

24

defendant, nor is there any indication that police were acting for reasons other than to determine whether defendant had committed the crime or was just an unfortunate victim of circumstance. *See id*. at 363. Furthermore, evidence linking the gun recovered from the backyard of the house where defendant was found to both defendant and Embry confirms the reliability of Obyrne's identification of defendant as the man he had seen shoot Embry. In light of the totality of the circumstances, we cannot say that the on-scene identification "led to a substantial likelihood of misidentification." *Williams*, 244 Mich. App. at 542. Therefore, we find no violation of defendant's right to due process.

(Mich. Ct. App. Op., ECF No. 21-23, PageID.2869–2870 (footnote omitted).)

Petitioner argues that he was denied due process when the identification procedure was "'unnecessarily suggestive and conducive to irreparable mistaken identification,'" the same standard applied by the Michigan Court of Appeals. (Pet'r's Br., ECF No. 10, PageID.1512 (quoting *Stovall*, 388 U.S. at 301–02).) Petitioner then focuses on the fact that a one-man show-up identification is inherently suggestive. (Pet'r's Br., ECF No. 10, PageID.1513 ("This was a suggestive, police arranged identification. Trial counsel should have requested that the identification by suppressed.").)

It is indisputable that one-man show-up identifications are suggestive and police-arranged. That appears to be the premise of the court of appeals' analysis. Rather than focusing on the inherently suggestive nature of that procedure, the court skipped directly to the second element: the likelihood of misidentification.

Petitioner offers the following quote in support of his claim that one-man show-up identifications are unreliable:

Judge Friendly once op[i]ned that show-up identifications are so suggestive and of so little probative value that "it would seem that only the apparent weakness of this kind of identification, along with its traditional character, saves it from condemnation as being itself impermissibly suggestive." *Brathwaite v. Manson*, 527 F. 2d 323, 367 n 6 (1975) *rev'd on other grounds*, 432 U.S. 98 (1977).

(Pet'r's Br., ECF No. 10, PageID.1512.) Petitioner grossly misreads the Second Circuit's decision. First, the "kind of identification" that Judge Friendly was commenting on in the quoted language was an in-court identification:

> The difference for the prosecution between being allowed to offer evidence of a pretrial identification and being remitted to an in-court identification is substantial. A jury would naturally regard an identification made shortly after the crime as much more probative than an in-court identification. This is especially true of the perfunctory type of identification where the defendant is sitting at the counsel table; indeed it would seem that only the apparent weakness of this kind of identification, along with its traditional character, saves it from condemnation as being itself impermissibly suggestive.

*Brathwaite v. Manson*, 527 F. 2d 323, 367 n. 6 (2d Cir. 1975). Second, Petitioner's description of the Second Circuit's decision as reversed on other grounds with respect to the reliability of one-man show-up identifications is simply wrong. The Supreme Court's reversal of the Second Circuit's decision centers on the fact that it is the totality of the circumstances that matters—particularly the likelihood of misidentification as explained in *Biggers*—once the court has determined that the identification procedure was unduly suggestive. *Manson*, 432 U.S. at 99 (noting that "[t]his case presents the issue as to whether the Due Process Clause of the Fourteenth Amendment compels the exclusion, in a state criminal trial, apart from any consideration of reliability, of pretrial identification evidence obtained by a police procedure that was both suggestive and unnecessary" and concluding "that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations" and "[t]he factors to be considered are set out in *Biggers*").

Petitioner does not address the *Biggers* factors relating to reliability at all. Not surprisingly, because the clearly established federal law cited by the court of appeals includes *Stovall* and *Biggers*, the court of appeals analysis is centered on reliability. Those factors include:

(1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness' degree of attention;

(3) the accuracy of the witness' prior description of the criminal;

(4) the level of certainty demonstrated by the witness at the confrontation; and

(5) the length of time between the crime and the confrontation.

*Smith v. Davis*, No. 23-3604, 2024 WL 3596872, at \*6 (6th Cir. July 31, 2024) (citing *Biggers*).

The court of appeals' determined:

> Obyrne saw the gunman's face and noticed the distinctive clothing he was wearing. Additionally, he told police where he had last seen the gunman, which allowed police to track the gunman to a house, where they found defendant sitting on the house's porch. Because Obyrne had seen the perpetrator commit the crime just 10 minutes earlier, the perpetrator's appearance was still fresh in Obyrne's mind. . . . In light of the totality of the circumstances, we cannot say that the on-scene identification "led to a substantial likelihood of misidentification."

(Mich. Ct. App. Op., ECF No. 21-23, PageID.2870.) Those factual determinations by the court of appeals are presumed correct and Petitioner offers no evidence to counter those determinations. Moreover, the court of appeals' analysis tracks the *Biggers* factors.[11]

The appellate court also rejected Petitioner's ineffective assistance of counsel claim that was based on counsel's failure to attempt to suppress the identification:

> Because we conclude that the on-the-scene identification was not improper, we also conclude that defense counsel did not render constitutionally ineffective assistance by failing to object to Obyrne's in-court identification of defendant on the basis that it had been tainted by the on-the-scene identification. Counsel is not ineffective for

---

[11] *See also, e.g., Hastings v. Cardwell*, 480 F.2d 1202, 1203 (6th Cir. 1973) (citing *Biggers* and noting that "in circumstances where there was excellent opportunity for the victim to observe the offender and the identification was made promptly thereafter in the normal course of a police investigation, and under circumstances when a line-up would have been difficult or impossible, there is no per se violation of the due process clause of the Fourteenth Amendment in a one-on-one show-up"); *Gross v. Warden, Lebanon Corr. Inst.*, 426 F. App'x 349, 362, 366 (6th Cir. 2011) (citing *Biggers* and stating "[b]oth Wright and Jones had the opportunity to view the assailant at the time of the crime, gave general descriptions of Gross before their identification of him, and made their identifications only hours after the crime occurred[; t]herefore, we find that the identifications were reliable").

failing "to advocate a meritless position." *People v. Mack*, 265 Mich. App. 122, 130; 695 N.W.2d 342 (2005) (quotation marks and citation omitted).

(*Id*.) That determination is also entirely consistent with *Strickland*. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) (explaining that, applying the *Strickland* test, "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial").

Petitioner has failed to show that the Michigan Court of Appeals' resolution of this issue is contrary to, or an unreasonable application of, clearly established federal law. Thus, he is not entitled to habeas relief on this ground.

### D.      Counsel Failed to Challenge Two Biased jurors (Habeas Ground III)

Petitioner argues that he was denied a fair and impartial jury because his counsel failed to challenge two biased jurors. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted).

"The voir dire is designed 'to protect [this right] by exposing possible biases, both known and unknown, on the part of potential jurors.'" *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). Voir dire plays an important role in ensuring the impartiality of the jury selected:

> It is true that "[v]oir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). The Constitution, after all, does not dictate a catechism for voir dire, but only that

the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. *Dennis v. United States*, 339 U.S. 162, 171–172 (1950*); Morford v. United States*, 339 U.S. 258, 259 (1950). "Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).

*Morgan*, 504 U.S. at 729–30 (parallel citations and footnote omitted).

Jurors are presumed to be impartial. *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) (citing *Irvin*, 366 U.S. at 723). When a juror's impartiality is called into question, the relevant issue is "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)); *see also Miller v. Webb*, 385 F.3d 666, 673 (6th Cir. 2004). The trial court must determine whether the juror demonstrates "actual bias"; that is, "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Miller*, 385 F.3d at 673–74 (internal quotation marks omitted). "A juror's express doubt as to her own impartiality on voir dire does not necessarily entail a finding of actual bias. The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on voir dire." *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001) (citing *Patton*, 467 U.S. at 1032). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. In evaluating the juror's ability to lay aside partiality, the Sixth Circuit has identified a number of important factors, including the following: "the juror's own estimation of the relevance of [the information giving rise to her partiality]; any express indications of partiality by [the] juror . . . and the steps taken by the trial court in neutralizing this information." *Hughes*, 258 F.3d at 459 (quoting *Gall v. Parker*, 231 F.3d 265, 308 (6th Cir. 2000)).

The question of bias of an individual juror at a state criminal trial is one of fact. *Dennis*, 354 F.3d at 520 (citing *Patton*, 467 U.S. at 1036); *see also Sizemore v. Fletcher*, 921 F.2d 667, 672–73 (6th Cir. 1990) (citing *Smith v. Phillips*, 455 U.S. 209, 218 (1982)). Petitioner bears the burden to establish the existence of juror bias which caused him to suffer actual prejudice. *See Smith*, 455 U.S. at 215–17 (stating that petitioner bears the burden to demonstrate that he suffered "actual bias" as a result of juror misconduct); *United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000); *Sheppard v. Bagley*, 657 F.3d 338, 348–49 (6th Cir. 2011) (Batchelder, J., concurring).

Petitioner contends not only that he suffered the prejudice of a biased jury, but also that counsel rendered ineffective assistance because he failed to challenge the two biased jurors. The deference afforded counsel's strategic decisions extends to the voir dire process. *Hughes*, 258 F3d at 457 ("Counsel is also accorded particular deference when conducting voir dire."). Counsel's actions during voir dire are considered to be matters of trial strategy. *Id*. Strategic decisions relating to voir dire cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness. *Id*.

Petitioner contends that one juror was biased because he thought he might have worked with a relative of Mr. Embry; a relative that he indicated was a "friend." Petitioner acknowledges, however, that the juror "said he had not formed any opinions or conclusions about the case based on this friendship and that he could set aside whatever he heard in the news." (Pet'r's Br., ECF No. 10, PageID.1515.) The voir dire transcript also indicates that the juror did not know for sure if his co-worker was a relative of Mr. Embry because he "didn't want to ask her." (Voir Dire Tr., ECF No. 221-6, PageID.2326.) Additionally, the juror assured the court that if, in fact, his co-worker was a relative of Mr. Embry, it would not affect the juror. (*Id*.)

Petitioner contends that another juror should have been challenged because he was worried about his work obligations. (Pet'r's Br., ECF No. 10, PageID.1515–1516.) Petitioner does not explain how that concern—a common concern for almost all jurors—would bias the juror against Petitioner.

The Michigan courts did not address this issue on the merits.[12] The trial court's procedural rejection of the claim constitutes a procedural default. Whether that procedural default bars this Court's review depends on whether Petitioner has shown cause. The offered cause is the ineffective assistance of appellate counsel for failing to raise the issue on direct appeal. Whether that failure was professionally unreasonable or prejudicial necessarily depends on considering the merits of the underlying claim. For that reason, the Court will simply address the merits *de novo*.

Petitioner bears the burden of showing juror bias. The voir dire exchanges upon which Petitioner relies do not support his claim that these two jurors were biased at all. Accordingly, Petitioner has failed to show that he is in custody in violation of his constitutional rights because of a biased jury. Moreover, because his claim of juror bias lacks merit, it was neither professionally unreasonable nor prejudicial for counsel to forego challenging the two jurors. Accordingly, Petitioner is not entitled to habeas relief on this claim.

---

[12] The trial court concluded that the court was barred from granting relief under Mich. Ct. R. 6.508(D) because Petitioner could have raised, but did not raise, the issue on direct appeal and then failed to establish prejudice. The trial court's decision appeared to hinge on Petitioner's failure to demonstrate prejudice. The trial court explained that the court of appeals had previously noted that "[t]he police had substantial evidence linking defendant to the crime" and, therefore, Petitioner could not establish the prejudice necessary to consider the issue for the first time on a motion for relief from judgment. (Calhoun Cnty. Cir. Ct., ECF No. 21-18, PageID.2722.)

**E.**   **Prosecutor Committed Misconduct when He Argued Facts Not in Evidence and Impermissibly Commented on Petitioner's Silence (Habeas Grounds IV and VIII)**

Petitioner next challenges the prosecutor's statements in opening and closing arguments. To succeed on his claims of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith*, 455 U.S. at 219. In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner. *See United States v. Young*, 470 U.S. 1, 11– 12 (1985). The Supreme Court has described the *Darden* standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012). The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

**1.**   **Arguing Facts Not in Evidence**

During the prosecutor's opening statement, he stated:

What I believe the testimony will show [is] that in the early hours of November 9, 2014, in the area of 263-265 Parkway, there were various parties going on in the street that day.

<u>**There came a time when Mr. Embry and Mr. Taylor passed each other at one of these parties. I believe – I believe the testimony will show that there was a 35-minute gap by the time Mr. Taylor left and Mr. Embry went in.**</u> That's going to be important later on, because I'm going to ask you for a form of homicide known as "first degree premeditated."

<u>**Mr. Taylor leaves, Mr. Embry stays in that house for another half-an-hour.**</u> At a certain point in time, Mr. Embry leaves the (inaudible) walks to the other side of the street, gets in his vehicle. <u>**At that point, I believe the witnesses will say he –**</u>

**who was either behind the telephone pole, bushes, or a wooded area** – runs up to the car, shoots once through the glass. After the glass breaks, leans in, and shoots him a second time, and leaves.

(Trial Tr. I, ECF No. 21-4, PageID.2048–2049 (emphasis added).)[13] Petitioner contends that there was no evidence presented at trial with regard to any of the bolded underlined representations. (Pet'r's Br., ECF No. 10, PageID.1521.) Petitioner contends the representations were material in that they were offered as the foundation for a determination that the shooting was premeditated. (*Id*., PageID.1522.)

Petitioner's characterizations of the evidence presented at trial and the prosecutor's reason for making the representations are well-supported by the record. Nonetheless, it was clear by the end of closings that the prosecutor had not presented any evidence regarding the events that may or may not have occurred between Petitioner and Mr. Embry earlier that night. The prosecutor's evidence of premeditation was contracted down from the hour preceding the shooting to the

---

[13] Although Petitioner does not specifically rely on any other statements during opening argument in support of his prosecutorial misconduct claim, the prosecutor did make additional statements similar to those quoted above. For example, the prosecutor stated:

> At the conclusion of this trial, I'm going to ask you-ask you really hard to look at first degree premeditated murder. Very specific elements that I have to prove.

> And--and I'm not—I'm not skirting any issues or hiding anything. The thing I want you to look at is did he have enough time to think about what his actions were. And why this one witness's testimony is so key is **there will be a half-hour gap from when he leaves the house in his car to when he's found a half-hour later. And what's interesting about that is he's not in the car anymore.** So I can't tell if he was dropped off, if he parked on a different location, or what. But the witnesses will say he came out of the blue, ran up to the car, and shot him.

> My theory as we go along will be that he knew what he was going to do that day and **he sat and either waited for the full 30 minutes**, or he had sufficient time to think about what he was doing before he walked up point blank and shot this man twice.

(Trial Tr. I, ECF No. 21-4, PageID.2051–2052 (emphasis added).)

seconds it took for Petitioner to walk to the car and pull the trigger twice. (Trial Tr. III, ECF No. 21-7, PageID.2374–2376, 2378, 2382–2383.) Whatever longer period the prosecutor had mentioned during the opening statements had clearly been abandoned. And defense counsel focused on that. The prosecutor's opening had suggested that Petitioner was lying in wait until Mr. Embry returned to his car after leaving the party.[14] Petitioner's counsel explained to the jury:

> There's no hiding behind a telephone pole. There is no telephone pole. There's no jumping out of the woods. There's no crouching down behind a dumpster. There's no element of surprise. There's no element of planning or premeditation.

(*Id.*, PageID.2381.) Thus, it does not appear that the jury had any reason to be confused on that point.

The Sixth Circuit Court of Appeals addressed an argument similar to Petitioner's in *United States v. McShan*, 757 F. App'x 454 (6th Cir. 2018). In *McShan*, the prosecutor stated in opening remarks that the jurors were "going to have the eyewitness testimony of Mr. Brandon as to what happened during those deals, and you're going to have testimony from law enforcement officers who were actually on surveillance and saw those deals during that time." 757 F. App'x at 463. But at trial, the "law enforcement officers" testified that they did not personally witness David McShan engaging in a narcotics transaction and no other testimony supported the prosecutor's statement. *Id.* The court determined that the prosecutor's failure to present that evidence did not warrant reversal:

> But not every variance between a prosecutor's description of the evidence during an opening statement and the actual presentation of the evidence to the jury

---

[14] Although there was no record evidence regarding Petitioner's whereabouts or activity before he walked to Embry's car, there was evidence at the preliminary examination from witness Obyrne that indicated that Embry had left the party and walked to his car. (Prelim. Exam. Tr. I, ECF 21-2, PageID.1975.) Obyrne is apparently also the source of the "10 seconds" duration of the incident.(*Id.*, PageID.1977 ("From the time the guy walked out of his house to get in his car to seeing the other guy run away from the scene – [the whole thing lasted] eight seconds/nine seconds, maybe.").)

constitutes reversible error. *Frazier v. Cupp*, 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). As the Supreme Court has cautioned, "[m]any things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance." *Id*. And here, the trial court gave multiple "proper limiting instruction[s]," *id*., instructing the jury that the statements, questions and arguments of counsel were not to be considered as evidence in the case. These instructions mitigated any harm that might have flowed from the discrepancy between this remark in the opening statement and the evidence presented at trial. *See id.*; *United States v. Campbell*, 317 F.3d 597, 607 (6th Cir. 2003); *United States v. Burns*, 298 F.3d 523, 543 (6th Cir. 2002).

*McShan*, 757 F. App'x at 463–64; *see also Hoover v. Trierweiler*, No. 18-1531, 2018 WL 5819499, at *4 (6th Cir. Aug. 29, 2018) (citing *Frazier*); *Bacon*, 2016 WL 7009108, at *4 (citing *Frazier*); *Olson v. Little*, 604 F. App'x 387, 404–05 (6th Cir. 2015) (citing *Frazier*).

The trial judge here offered the following cautionary instructions:

[O]pening statements aren't evidence. You cannot decide this case whatsoever based on the opening statements. Those are simply the opportunity the law provides to the parties to outline their theory about the case. (Voir Dire Tr., ECF No. 21-6, PageID.2354.)

When both sides have concluded the presentation of their case, the attorneys will present their closing arguments. They'll summarize what they contend the evidence has proven or not proven by that point. And those aren't evidence either. Those are simply the opportunity to present the jury with the views, the perspectives of the attorneys at the end of the case. (*Id*., PageID.2355.)

When you decide this case, you have to base your verdict only on the evidence. Evidence has a particular meaning. The fact we're here for a trial with four separate counts is not evidence. The lawyer's opening statements, as I've already told you, are not evidence. Their closing arguments aren't evidence. In fact, their questions they ask the witnesses are not evidence. It's only the answers of the witnesses that are--that are the evidence. My instructions and rulings on objections as we proceed with the case are not evidence either.

Evidence has a particular meaning. It is the answers that a witness has given from the witness stand under oath, any exhibits that are admitted into evidence, and if there are any stipulations, any stipulations that the lawyers reach in place of a witness's testimony. If there are such things, then you can consider that as evidence as well. But nothing else is evidence and you cannot decide anything in this case on anything which is not evidence. (*Id*., PageID.2357.)

> [Y]ou must rest your verdict only on the evidence properly admitted, not on anything which is not evidence.
>
> It is not evidence that we are here for a trial. It is not evidence that there are four charges against the Defendant. The opening statements of the lawyers are not evidence, their questions to the witnesses are not evidence. Their closing arguments are not evidence. My rulings and instructions are not evidence. (Trial Tr. III, ECF No. 21-7, PageID.2391.)

Moreover, "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

The Court concludes that, based on the clear closing arguments and the repeated instructions regarding what was and what was not evidence, Petitioner has failed to carry his burden. He has not shown that the opening statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Therefore, Petitioner is not entitled to relief on habeas ground IV.

### 2.    Comments Regarding Petitioner's Silence

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, in order to protect an individual's Fifth Amendment privilege against self-incrimination, when an individual is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 478–79; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). To protect the right to remain silent, the prosecutor may not introduce evidence of an accused's prearrest silence as substantive evidence of guilt. *Combs v. Coyle*, 205

F.3d 269, 285 (6th Cir. 2000).[15] Similarly, the Sixth Circuit Court of Appeals has concluded that post-arrest pre-*Miranda* silence cannot be used as substantive evidence of guilt. *Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009). And, of course, post-arrest post-Miranda silence cannot be used as substantive evidence of guilt. *See, e.g., Wainwright v. Greenfield*, 474 U.S. 284 (1986).

Even though silence can never be used as substantive evidence of guilt, Petitioner contends that the prosecutor invited the jurors to do exactly that during this section of closing argument:

> Using all of our collective common senses, what would it tell you when this person took numerous steps to the back of the car, approached the car, and immediately began, and subsequently ran away? Would a person who does not have a guilty mind immediately run? Would he try to hide on someone else's porch? Would he try to discard the gun approximately 25 to 30 feet away from him? If there was a reason why he had shot him, wouldn't he have talked to the police about it? So there's a lot of good questions we all may have, but once again, these are not elements that I have to prove today.

(Trial Tr. III, ECF No. 21-7, PageID.2377.)[16] The focus of Petitioner's complaint is the penultimate sentence from the above quote: "If there was a reason why he had shot him, wouldn't he have talked to the police about it?" It is difficult to see that language as anything other than a comment on Petitioner's silence and an invitation to infer guilt—or at least infer no reason for the shooting—from silence.

Respondent contends that Petitioner voluntarily talked to police after hearing his *Miranda* rights and never invoked those rights. Respondent's contention would be material if the prosecutor had invited the jurors to use Petitioner's silence to impeach Petitioner. *See, e.g.*, *Doyle v. Ohio*, 426 U.S. 231 (1980); *Jenkins v. Anderson*, 447 U.S. 231 (1980); *Fletcher v. Weir*, 455 U.S. 603

---

[15] The state courts did not decide this issue on the merits; so this Court's review is *de novo*. This Court is not limited to clearly established federal law—Supreme Court authority—when conducting *de novo* review of a habeas issue. *See, e.g.*, *Stermer*, 959 F.3d at 727 n.5 (noting that Sixth Circuit authority is applicable to "habeas cases where AEDPA deference does not apply").

[16] Petitioner did not include the last sentence when setting out the quote he contends violated his constitutional rights. (Pet'r's Br., ECF No. 10, PageID.1536.)

(1982). But Petitioner did not testify and there were no statements attributed to Petitioner that would have been impeached by Petitioner's silence.[17]

The Court concludes that the prosecutor's comment was an invitation to infer something, presumably something favorable to the prosecution and unfavorable to Petitioner, from Petitioner's silence. The invitation to infer anything from Petitioner's silence runs contrary to the right against self-incrimination and the *Miranda* warning's purpose to secure that right. Thus, the reference violated Petitioner's constitutional rights.

For reasons of finality, comity, and federalism, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S. 438,

---

[17] The testimony of Detective Reinstein outlined the subject matter of the only reported interview of Petitioner:

| | |
|---|---|
| Prosecutor: | Approximately how many number of times did you speak with Mr. Taylor during this investigation? |
| Det. Reinstein: | I had the one interview or the--the one documented interview contact with him in our interview room. |
| Prosecutor: | Approximately how long did that last? |
| Det. Reinstein: | It was not very long. I did read him his rights per Miranda, which he did sign. He agreed to speak with me; however, it became evident pretty quick that--when I asked him where he was found or where he was located, he advised something to the effect of, "I was_."--when I asked him where he was at he said something to the effect of, "At my homeboys Grandma's house." When I continued to speak with him further after reading him his rights, he basically had said--said something to the effect of, "I ain't gonna say shit". So it--it was pretty evident pretty quickly that we--he never asked for a lawyer, but he made it evident that we were not going to speak very in-depth on this. |

(Trial Tr. II, ECF No. 21-5, PageID.2265.)

449 (1986)). Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). There must be more than a "reasonable possibility" that the error was harmful. *Brecht*, 507 at 637 (internal quotation marks omitted). The *Brecht* standard reflects the view that a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam). There can be little question that the harmless error analysis is applicable to the type of violation at issue here because Brecht also was complaining about the prosecution's improper references to his post-*Miranda* silence. *Brecht*, 507 U.S. at 624–27.

The Court concludes that the reference to Petitioner's silence was harmless. It is not entirely clear what precisely the prosecution was inviting the jury to infer. The question the prosecutor asked—"If there was a reason why he had shot him, wouldn't he have talked to the police about it?"—does not invite the jurors to find Petitioner guilty of the shooting because of his silence. The evidence presented at trial that Petitioner had fired the shots that killed Mr. Embry was overwhelming. The most significant issue remaining for the jury was premeditation. But the invited inference—Petitioner had no reason for the shooting—does not really push resolution of the premeditation issue in one direction or the other.[18] Indeed, there is a compelling argument that inviting the jurors to infer that Petitioner had no reason for the shooting augurs against a finding

---

[18] Petitioner argues that the prosecutor's question implied "that there was no justification or excuse for the killing because Petitioner did not justify or explain it after being arrested and [hearing] his *Miranda* warnings." (Pet'r's Br., ECF No. 10, PageID.1537.) In fact, there was no claim of justification or excuse raised for the killing before, during, or after Petitioner's arrest or at the trial. The jury had no basis to conclude that the killing was justified or excused.

39

of premeditation. In light of the overwhelming evidence that Petitioner fired the shot[19] and the ambiguous significance of the invited inference, the Court determines that the reference to Petitioner's silence did not have a substantial and injurious effect or influence in determining the jury's verdict. Any error was harmless and Petitioner is not entitled to habeas relief on this ground.

F.    **Counsel Failed to Investigate Potential Defenses or Subject the Prosecution's Case to Meaningful Adversarial Testing (Habeas Grounds V and VI and XIV)**

Petitioner faults trial counsel for failing to investigate, failing to communicate with or call potential witnesses Richard Young or Jerry Morris, failing to discover or call witnesses Matthew Campbell or Demario Hodges, failing to present the argument that Petitioner's killing of Mr. Embry was justified by self-defense, and for advising Petitioner to not testify. The crux of this claim is that Petitioner had a compelling claim of self-defense that would have justified the shooting. To put that defense into context, it is worthwhile to review the evidence offered by the neutral eyewitnesses to the shooting.

Witness John Obyrne[20] was on his front porch during the early morning hours of November 9, 2014. There was a party going on at the house next door. Mr. Obyrne saw Mr. Embry leave the party and walk to his car, which was parked across the street from Mr. Obyrne's house, perhaps 30 or 40 feet away. Embry got into the car and sat there. Mr. Obyrne testified that it appeared that Embry was talking on his phone. Mere seconds later, a person—Petitioner—walked up from

---

[19] Petitioner acknowledges the overwhelming nature of the evidence against him: "the evidence that Petitioner was the shooter was overwhelming, consisting of matching ballistics and eyewitness identification, and trial counsel conceded, in closing arguments, that Petitioner was the shooter." (Pet'r's Br., ECF No. 10, PageID.1536.)

[20] This description of Mr. Obyrne's testimony is taken from the preliminary examination transcript and the trial transcript. (Prelim. Exam. Tr. I, ECF No. 21-2, PageID.1973–1983; Trial Tr. II, ECF No. 21-5, PageID.2225–2246.) Mr. Obyrne testified at the preliminary examination on November 20, 2014, less than two weeks after the shooting. He testified at the trial on April 15, 2015, approximately five months after the shooting.

behind Embry's car. Obyrne noticed Petitioner when he was about 15 or 20 feet away from the car. Petitioner approached the driver's door. Petitioner got within about a foot of the driver's door window. Petitioner had something in his hand that Mr. Obyrne could not initially identify. Petitioner did not say anything. Petitioner immediately put the item in his hand through the window. Mr. Obyrne then heard two gunshots and saw two flashes. Mr. Obyrne estimated that the shots were no more than one second apart. Petitioner then walked around behind the car and went through the yard of the house across the street. The car took off and drove down the street.[21]

Mr. Obyrne said that from the time Embry walked out of his house to the time Petitioner fled was perhaps 10 seconds. Mr. Obyrne indicated that he did not hear any other gunshots, nor did he hear the gentleman in the car say anything. In fact, Mr. Obyrne did not hear any words exchanged between Petitioner and Mr. Embry.

Mr. Obyrne also noticed a car parked in front of Mr. Embry's car. The other eyewitness, Meosha Brown,[22] was in the passenger seat of that car. Ms. Brown observed someone approach the car parked behind hers, Mr. Embry's car. Then she heard gunshots. She said she did not see or hear anything else.

Petitioner's version of the events of that night is irreconcilable with the testimony offered by Mr. Obyrne and Ms. Brown at trial.[23] Petitioner notes that he explained to his trial counsel that

---

[21] Mr. Embry crashed the car almost immediately. The distance Mr. Embry drove his car from 263 Parkway—Mr. Obyrne's address—to 190 N. Wood Street—where Mr. Embry crashed—is about a quarter of a mile.

[22] Ms. Brown testified on April 15, 2015, approximately five months after the shooting. (Trial Tr. II, ECF No. 21-5, PageID.2219–2224.)

[23] Petitioner's version is taken from his affidavits filed in connection with his motions for relief from judgment and subsequent appeals. The affidavits appear many times in the record. Although it appears the affidavits are the same each time, the Court is specifically referencing Petitioner's January 7, 2018, Affidavit attached to his first motion for relief from judgment, (ECF No. 21-15,

he had frequent encounters with Mr. Embry before that night, that Embry had assaulted Petitioner, held guns to Petitioner's head, and threatened to kill Petitioner before that night, and that Embry had also previously assaulted and threatened Petitioner's friends in Petitioner's presence. Petitioner told trial counsel that Jerry Morris and Richard Young had witnessed these events. Petitioner also told trial counsel that Jerry Morris had information regarding the shooting.

Against that backdrop, Petitioner reported to counsel this course of events on the night of the shooting:

> It was early November, on or about the 8th, approximately 3 or 3:30 a.m. He was walking from his friend's grandmother's house on 213 Howland. He was on his way to his mother's house at 144 Ann Ave, and as he began to walk down Parkway he saw Xavier. Xavier then noticed him and told him to come over, stating, "Let me holla at you."
>
> Xavier was seated in a white car, and as he approached the car window, Xavier first sat there staring at him, then tried to get out of the car suddenly, stating, "I'm gonna blow your brains out!" Seeing the gun in Xavier's hand, he threw his hip into the driver's door to prevent Xavier from exiting and pulled his own gun out. After applying his full body weight the door closed and he pointed his gun at Xavier to let him know he would defend himself. Xavier then shoved hard against the door and managed to open it, shoving through the door and into the gun, which accidentally went off. This caused him to go through the door's window as it shattered. This took approximately 3-5 seconds for everything to take place.
>
> He pulled his gun in self-defense and out of fear that Xavier was going to kill him, a fear grounded in his previous interactions with Xavier. He had also seen Xavier pistol whip and rob two of his acquaintances at a summer party in July. Xavier had, at the time of the party, tried to force a gun in his mouth, saying that he would kill him Xavier then shot the gun off next to my acquaintance's head and left with his girlfriend, Shantay Handy. The people present at the party were Jerry Morris, his brother Konfonzie, and his friend Treimaine. Kenfonzie and Treimaine were beat with a gun and robbed in front of the whole party.
>
> In or about October or September, he was on Howland after leaving work early, he was with his friend/co-worker, Richard Young, riding around with Young as a passenger. Xavier came from across the street and had a silver revolver, which he shoved through the gap in my window. He said that this was the second time he

_____
PageID.2690–2692), and his February 23, 2017, Affidavit attached to the same motion, (ECF No. 21-15, PageID.2699–2700).

was putting a gun to his head, and that there would not be a third, and that he was going to die that night. Xavier tried to open the door but he had already locked it. Richard Young had gone to his apartment but as he was coming back out stopped Xavier after seeing that Xavier by this time had both the silver revolver and a black handgun pointed in his face. Richard Young asked what the problem was, and Xavier stated, "F.U., what would you do if he was dead on yo passenger seat when you came outside?" Richard Young got in the car and prepared to drive off, as Xavier swore on his mother's grave that he would kill him.

On or about 12:00 a.m. Thursday night/Friday morning, the week of the shooting, he saw Xavier at Dickman St. in the store where he was cashing his check. Xavier approached him and asked for a cigarette. While giving Xavier a cigarette, Xavier told him to give him a call because there was an ''SOB'' that he wanted to get at. where he worked and to give Xavier a call. He was confused, but relieved that he had been neither robbed nor shot.

He believes that it was due to Xavier being sober at the store that there was no altercation, and that he believes pills and liquor play a big role in Xavier's behavior. Xavier gets drunk, uses cocaine and gets violent. He knows this from observing Xavier for 15 years.

He did not murder Xavier. He had no time to think, and if he had ran, Xavier would have shot him in his back. If he had let Xavier out of the car he would have been robbed or shot. He has explained this to all four of his attorneys and provided necessary information concerning contacting the witnesses involved, including addresses and phone numbers, to help prove his innocence.

After seeing Xavier at the store and not having an altercation, he walked over to the car to see what he wanted, thinking that Xavier would not become violent. Xavier would certainly have pistol whipped him or shot him or both if he had been able to get out of the car. Because Xavier had the gun, he was dangerous, unpredictable, and would have been shot in the back if he had run, which would also have endangered the nearby small [crowd]. He had no choice but to protect himself and did not murder or intend to murder Xavier.

(ECF No. 21-15, PageID.2699–2700 (paragraph numbers omitted).)

Certainly, if Petitioner and his counsel were writing on a blank slate, Petitioner's version supported by others might present a colorable defense. But Petitioner's version is contradicted by Mr. Obyrne's version on several points. Mr. Obyrne's version leaves little, if any, room for Embry's purported threat to kill Petitioner, Petitioner throwing his hip into the driver's door,

Petitioner "pulling out" his gun, Embry opening the door, Petitioner's gun accidentally firing,[24] or Embry going through the shattered window. Petitioner's version also fails to account for the second shot. Moreover, it is troubling that Mr. Embry's gun never materialized during the investigation.

Critically, pursuing the justification defense was not without risk. If the jurors found Obyrne's description of the event credible, Petitioner's focus on his violent history with Embry would have essentially established a motive and easily supported the prosecution's theory that Petitioner's actions were premeditated. Essentially, the path Petitioner wanted his counsel to follow was an "all or nothing" strategy where the "nothing" option rested on a shaky foundation.

Although Petitioner faults counsel's trial strategy, it left open the possibility that the jurors would conclude that the few second encounter described by Mr. Obyrne was simply too short to evidence premeditation. Put differently, counsel's approach probably yielded a greater chance that Petitioner would not spend the rest of his life in prison.

As set forth below, Petitioner contends that this Court should hold an evidentiary hearing to test whether counsel's approach was supported by any strategy. Counsel's subjective intention is not the issue. As noted above, *Strickland* commands this Court to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." 466 U.S. at 689. Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel*, 350 U.S. at 101). Stated another way,

---

[24] If Petitioner's gun fired accidentally, that fact may foreclose justification by self-defense. "A finding that a defendant acted in justifiable self-defense necessarily requires a finding that the defendant acted intentionally, but that the circumstances justified his actions." *People v. Heflin*, 456 N.W.2d 10, 19 (Mich. 1990). If the defense presents evidence that the shooting was accidental, that would be inconsistent with a claim of self-defense. *People v. Guajardo*, 832 N.W.2d 409, 417–18 (Mich. Ct. App. 2013); *see also People v. Trammell*, 247 N.W.2d 311, 313–14 (Mich. Ct. App. 1976) (holding that the trial court did not err by refusing to give a self-defense instruction when the defendant argued that his actions were an accident).

to overcome the presumption of regularity Petitioner must show that counsel's challenged approach *cannot* be considered sound trial strategy. Based on the strategy rationale stated above, the Court concludes that Petitioner has failed to meet his burden.

Petitioner's argument also falls short in other ways. First, the record does not support Petitioner's claim that trial counsel did not investigate the self-defense theory. None of Petitioner's proposed witnesses state that counsel did not talk to them.[25] Moreover, Petitioner's proposed witness Jerry Morris even received a subpoena to testify at trial, (Aff. of Jerry Morris, ECF No. 21-15, PageID.2696–2697), suggesting that counsel's failure to call him at trial was no accident.

Jerry Morris's affidavit reveals a few details regarding Mr. Embry's violent encounters with Petitioner, Konfonzie, Triemaine, and Morris during July of 2014. Additionally, Morris avers that he was driving down Parkway when Embry walked out of the party. Morris notes that Embry was carrying a phone and holding a black pistol. Morris claims that he then headed down Parkway to the Parkway Projects and parked his car. A minute later, Morris heard gunshots.

Petitioner offers other affidavits as well. For example, Petitioner offers two affidavits from trial witness Meosha Brown. Her affidavits reveal why counsel may have been concerned about the credibility of Petitioner's supporting witnesses. At trial Ms. Brown testified that she observed someone approach the car parked behind hers, Mr. Embry's car. Then she heard gunshots. She said she did not see or hear anything else. During Petitioner's appeal as of right, Ms. Brown offered the following sworn averments as accurate, complete, and inclusive of all relevant information:

---

[25] It is noteworthy that the counsel that presented Petitioner's defense at trial was Petitioner's second appointed trial counsel. Petitioner was dissatisfied with every counsel appointed for him. Indeed, Petitioner burned through four appointed appellate counsel as well. Each counsel moving to withdraw because Petitioner demanded the presentation of issues that counsel deemed inadvisable. Even Petitioner's fourth appellate counsel attempted to withdraw. The court would not allow it.

I Meosha Brown was on Parkway on or about November 8, 2014, at 3:30 a.m. when a shooting took place.

Some one in a dark camo sleeve jacket approach a guys car window for a brief moment, and he walked away before the shooting.

I was approximately 5 to 7 feet away, and I am 100% sure the man in the camo sleeve jacket was not the shooter, he was not at the car window anymore.

After the man in the camo sleeves jacket walked away, some body wearing an all black hoody walked up and then I heard gun shoots,

I was under a great deal of stress, and I felt pressured, into my previous testimony. I have made a mistake, and I'm willing to testify to these facts in court.

(May 21, 2016, Aff. of Meosha Brown, ECF No. 21-23, PageID.2956 (errors in original).)[26] Ms. Brown's affidavit cannot be reconciled with her trial testimony.

The May 21, 2016, affidavit was not Ms. Brown's last sworn statement regarding that evening. In fact, it appears it was not the only Meosha Brown affidavit prepared for Petitioner's direct appeal. Ms. Brown signed another affidavit during December of 2016, swearing as follows:

Early November 2014, I was parked outside of a relatives house, with a friend.

I was parked in front of 362 Parkway in the City of Battle Creek, State of Michigan, the time was around 3:30 a.m.

It was during this time and at this location that I saw Xavier Embry walking to a white car.

The reason I saw this was because the car was parked directly behind me.

While on the passenger side of the car, I could see Xavier talking on a cell-phone, while he was holding a black gun in his other hand, I saw this as he went to get into the car.

---

[26] This affidavit and appears to be the impetus for Petitioner's second appellate counsel to move on. By motion dated November 28, 2016, counsel moved to expand the record to include this affidavit and another from Demareo Hodges. The two affidavits were offered in support of "Mr. Taylor['s] desire[] to present alternative conflicting theories on appeal." (Mot., ECF No. 21-23, PageID.2952.) Counsel, apparently like trial counsel, did not agree with that strategy. (*Id*.) Counsel requested that the appellate court allow Petitioner more time to file a Standard 4 brief so he could present his argument. (*Id*., PageID.2953.)

> Seconds later I saw a figure with a camouflage design on the hoody, approach the driver's side window.
>
> Seconds later I heard gun shots.

(Dec. 2016, Aff. of Meosha Brown, ECF No. 6-8, PageID.570 (paragraph numbers omitted and errors in original.) Ms. Brown's second affidavit cannot be reconciled with her trial testimony or her first affidavit. Ms. Brown's ever-changing story deprives her affidavits of any credibility.

Petitioner also offers a handwritten statement from Matthew Campbell. (Oct. 8, 2019, Statement of Matthew Campbell, ECF No. 6-8, PageID.571–572.) Mr. Campbell did not know Petitioner or Mr. Embry, but he was standing on the sidewalk just a few feet from the passenger side of Embry's car when Embry walked out of 263 Parkway talking on a cell phone and holding a black gun in his other hand. Even five years after the fact, Mr. Campbell could recall that Embry called out to Petitioner "Aye dog come holler at me." (*Id.*, PageID.571.) Petitioner came to Embry's car window. Then Embry opened the car door. When the interior vehicle lights came on, Campbell saw that Embry was pointing a gun at Petitioner. Petitioner yelled at Embry "don't do it" and pulled out a silver gun. Campbell fled. He heard two or three gunshots. He stopped a few houses away at the intersection of Parkway and Kendall to catch his breath. While there, at that very spot, Mr. Embry drove by and threw the gun out of the window in the middle of the intersection. A couple days later, Campbell learned the names of the shooter and the victim from the news. He learned more about them through social media. He saw threats posted and heard rumors that Petitioner's mom's house had been "shot up." (*Id.*, PageID.572.) For that reason, he did not share what he knew with family or friends.

It is not clear how Petitioner learned about Campbell's presence on the street that night. Nonetheless, Petitioner and Campbell found each other. Unfortunately, Campbell's statement is of

no evidentiary value because it is unsworn. Thus, the Court cannot credit Mr. Campbell's statements.

Petitioner also submits the affidavit of Richard Young. (Nov. 22, 2019, Aff. of Richard Young, ECF No. 11-3, PageID.1576–1577.) Richard Young confirms Petitioner's description of the events of October 2014, when Embry purportedly pointed two guns at Petitioner's head. This testimony supports Petitioner's claim that he and Embry had previous violent encounters, but it does not directly support Petitioner's self-defense claim. As with Mr. Morris's testimony regarding the events during July of 2014, the testimony unfortunately provides a motive for Petitioner to shoot Embry and supports the charge of premeditated murder.

Finally, Petitioner submits an affidavit from DeMareo Hodges. (Oct. 29, 2020, Aff. of DeMareo Hodges, ECF No. 11-4, PageID.1579–1580.) Mr. Hodges says that on the night of the shooting, he was on the passenger side of Mr. Embry's car. He saw Petitioner walking down Parkway, he saw Embry get into his car, he heard Embry call to Petitioner, and he saw Petitioner go over to the driver's side window. He saw Embry grab something and heard Petitioner say, "Don't [d]o it." Hodges did not see Embry's alleged gun, and he did not see Petitioner's gun. He thought Embry might have tried to push the door open, but he does not mention the interior lights coming on.

Then Hodges heard gunshots so he ran towards the corner of Parkway and Kendall. Embry's car headed toward that intersection. Hodges heard something, perhaps Embry throwing something out the window. It also sounded like Embry's car hit something. Although Hodges and Campbell were in the same place at the same time and both took off running to the same place, Mr. Hodges does not mention Mr. Campbell and Mr. Campbell does not mention Mr. Hodges. Mr. Hodges's affidavit does not say that Embry had a gun or that he threatened Petitioner.

Mr. Hodges did not think that Petitioner saw him and believes that Petitioner would not have known Mr. Hodges was a witness to the shooting. Mr. Hodges, like Mr. Campbell, heard about Petitioner's mom's house being "shot up." It scared him enough that he did not come forward.

Part of the difficulty with Petitioner's presentation of the affidavits of Campbell, Young, and Hodges is that they are presented many years after the shooting. All three offer explanations as to why they did not come forward sooner. Those statements bolster Petitioner's claim that the affidavits constitute new evidence. But even that claim is disingenuous.

Petitioner knew all about the matters set forth in Young's affidavit at the time of trial. Petitioner apparently did not know about either Campbell's or Hodges's information at the time of trial and, in fact, he could not have known because neither was talking about the incident. For that reason, trial counsel cannot be faulted for failing to discover or present the information set forth in the affidavits of Campbell or Hodges. It appears that Petitioner has simply forgotten that this Hodges's affidavit is his second. Hodges signed the first affidavit during February of 2016, it even mentions Embry being killed. (Feb. 3, 2016, Aff. of Demareo Hodges, ECF No. 21-23, PageID.2955.) Petitioner offers no explanation for the four and three-quarter year wait for the second affidavit.

Considering all of the affidavits, the Court concludes that Petitioner has failed to show that trial counsel's performance was deficient for failing to present self-defense as a justification for the killing, through Petitioner's testimony or the testimony of the affiants. Moreover, considering the credibility of Mr. Obyrne's testimony compared to the credibility of the affiants, the Court also concludes that Petitioner has suffered no prejudice because of counsel's strategy. Presenting the self-defense testimony would not have changed the outcome.

G.    **Court Prevented Petitioner from Presenting a Complete Defense when the Court Refused to Adjourn the Trial (Habeas Ground VII)**

Petitioner sought a continuance on Tuesday, April 14, the first day of trial, after the jury was selected, but before it was sworn. Counsel wanted the continuance because the previous Friday the prosecution had provided "nearly 200 pages of supplemental reports that were not previously available" as well as the autopsy report and ballistics report. (Voir Dire Tr., ECF No. 21-6, PageID.2343.) Counsel contended that he needed the time to go over the new information with his client, particularly the supplemental police reports regarding additional interviews with eyewitnesses. The trial court advised Petitioner's counsel that he would give him time to go over the reports with Petitioner and, if necessary, give counsel an opportunity to question the witnesses outside of the courtroom before each witness testified. Petitioner contends that the court's denial of a continuance deprived him of his due process right to present a complete defense.

"The decision whether to grant a motion for continuance is within the discretion of the trial judge." *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003) (citing *Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964)); *see also Morris v. Slappy*, 461 U.S. 1, 11 (1983) (noting that trial courts have broad discretion in deciding whether to grant a continuance). "Absent proof of a violation of a specific constitutional protection, a habeas petitioner must show that a trial error was so egregious as to deprive him of a fundamentally fair adjudication, thus violating constitutional principles of due process." *Id.* (citing *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). A trial court's denial of a continuance rises to the level of a constitutional violation only when there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay. *Burton v. Renico*, 391 F.3d 764, 772 (6th Cir. 2004) (quoting *Morris*, 461 U.S. at 11–12 (quoting *Ungar*, 376 U.S. at 589)). In addition, a habeas petitioner must show that he suffered actual prejudice as a result of the trial court's denial of his request for a continuance. *Burton*, 391

F.3d at 772 (citing *Powell*, 332 F.3d at 396). "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefited the defense." *Powell*, 332 F.3d at 396.

Petitioner argues that the delay prejudiced his defense, (Pet'r's Br., ECF No. 10, PageID.1534–1535); but he makes the argument in the abstract. He never identifies how the delay prejudiced his defense. Counsel acknowledged that neither the autopsy report nor the ballistics report required more time. Rather, Petitioner wanted time to go over the supplemental police reports with Petitioner. The trial court indicated a willingness to give Petitioner that time as well as time to interview the witnesses. Moreover, counsel indicated that the interviews did not present any change in the expected testimony; it simply broadened the potential scope of the witnesses' testimony.

This is not a circumstance where the court arbitrarily insisted upon expeditiousness. The trial was initially scheduled for February 17, 2014, but Petitioner complained about his counsel and ultimately succeeded in securing the appointment of substitute counsel. That resulted in a two-month adjournment. Moreover, the jury had been selected and the witnesses subpoenaed. In the absence of some demonstrated prejudice flowing from the trial court's denial of a continuance, the court had sufficient reason to insist that the trial go forward. Accordingly, Petitioner has failed to demonstrate any constitutional violation flowing from the court's denial of his request for continuance. Petitioner is not entitled to relief on this habeas ground.

### H. Trial Counsel Failed to Ensure that Proper Jury Instructions Were Given (Habeas Ground X)

Petitioner next complains that trial counsel rendered ineffective assistance because he failed to either (1) object to evidence that Petitioner had committed other crimes or (2) request a

limiting instruction regarding the jury's use of such evidence. The evidence at issue is the following:

> Detective Reinstein testified that Petitioner "has a prior criminal history" and that Petitioner's refusal to give a buccal swab was of no consequence because "we already had his DNA on file at our station because we do keep DNA on file of people we swab." TT 4/15/15 115, 119. The detective also testified that Petitioner's nickname "Doghead" was "kind of common knowledge or it was spoken about by several officers and the other people that have worked for the agency." *Id.*, at 120.

(Pet'r's Br., ECF No. 10, PageID.1538.) Petitioner contends this "other crimes" evidence was prejudicial.

Petitioner's argument on this point is disingenuous. Petitioner was charged with being a felon in possession of a weapon. It was stipulated that Petitioner had been previously convicted of a felony and was not eligible to possess a weapon. No evidence was introduced regarding the nature of the felony. Moreover, the trial court gave a limiting instruction:

> You have heard evidence that was introduced to show that the Defendant was previously convicted of a felony for which he is not on trial. If you believe this evidence you must be very careful only to consider it for a certain purpose. You may only think about whether this evidence tends to prove a necessary element of one of the charges in this case; that is, whether the Defendant is guilty of being a felon in possession of a firearm. You must not consider this evidence for any other purpose, such as that he is more likely to be guilty of murder because he was convicted in the past of another assaultive offense. You must not decide that it shows the--that the Defendant is a bad person or that he is likely to commit crimes.

> You must not convict the Defendant here because you think he is guilty of other bad conduct. All of the evidence must convince you beyond a reasonable doubt that the Defendant committed these alleged crimes or you must find him not guilty.

(Trial Tr. III, ECF No. 21-7, PageID.2394.) Under the circumstances, there was no reason for trial counsel to object to the testimony nor was there a reason for counsel to request any limiting instruction other than the one the court gave. Petitioner's claim is factually unsupported. He is not entitled to relief for this habeas ground.

## I.    Appellate Counsel Failed to Raise Grounds III–X (Habeas Ground XV)

Finally, Petitioner contends that his appellate counsel failed to render effective assistance because he did not raise habeas grounds III–X. The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005). The appellate context, however, changes the bounds of reasonable professional assistance. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 287–88 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 288.

As discussed in detail above, Petitioner's habeas grounds III–X do not have merit. Failure to raise such meritless issues is neither professionally unreasonable nor prejudicial. *Coley*, 706 F.3d at 752.

Petitioner also argues that appellate counsel Daniel Bremer, Petitioner's fourth appellate counsel, failed to advise Petitioner of his right to file a *pro per* supplemental brief, failed to file a supplemental brief on Petitioner's behalf, and also failed to investigate and develop the issues Petitioner wanted to present.

A review of the procedural history of Petitioner's appeal is helpful in evaluating this claim. Petitioner was initially represented on appeal by the State Appellate Defender Office, specifically Attorney Brett DeGroff. Attorney DeGroff prepared Petitioner's initial motion to remand for a *Ginther* hearing[27] and Petitioner's appeal brief identifying the two issues that were raised in the court of appeals. Petitioner asked Attorney DeGroff to raise additional grounds "which appellate counsel believed he could not raise under the Michigan Rules of Professional Conduct." (Mot., ECF No. 21-23, PageID.3020.) Petitioner fired counsel. (*Id.*) Attorney DeGroff was removed from the case on July 11, 2016. (Calhoun Cnty. Cir. Ct. Order, ECF No. 21-23, PageID.3023.)

Attorney DeGroff was replaced by Attorney Laurel Kelly Young. (Calhoun Cnty. Cir. Ct. Order, ECF No. 21-23, PageID.3024.) Mr. Taylor did not agree with Attorney Young's approach or her refusal to raise certain issues. Nonetheless, Attorney Young sought leave for an extension to permit Petitioner to file a *pro per* supplemental relief. (ECF No. 21-23, PageID.2952–2953.) The court of appeals denied that request. (Mich. Ct. App. Order, ECF No. 21-23, PageID.2951.) Petitioner asked Young to remove herself. (Pet'r's *Pro Per* Mot., ECF No. 21-23, PageID.2949.) Attorney Young was permitted to withdraw on December 20, 2016. (Calhoun Cnty. Cir. Ct. Order, ECF No. 21-23, PageID.3039.)

Attorney Young was replaced by Attorney Ronald D. Ambrose. (Calhoun Cnty. Cir. Ct. Order, ECF No. 21-23, PageID.3040.) Attorney Ambrose moved to adjourn oral argument and withdraw as counsel because of a breakdown in the attorney/client relationship on March 17, 2017. (Mot., ECF No. 21-23, PageID.3116–3117.) He was permitted to withdraw on March 20, 2017. (Calhoun Cnty. Cir. Ct. Order, ECF No. 21-23, PageID.3056–3057.)

---

[27] In *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), the Michigan Supreme Court approved the process of remanding to the trial court for an evidentiary hearing when an appellant has raised claims of ineffective assistance of counsel that require development of a record.

The trial court then appointed Attorney Daniel D. Bremer. Petitioner wrote the court of appeals expressing his dissatisfaction with Attorney Bremer. (ECF No. 21-23, PageID.3069–3070.) Attorney Bremer also moved to withdraw because Petitioner asked him to do so. (Mot., ECF No. 21-23, PageID.3122–3123.) By that time, the court of appeals would not allow it. The court insisted that Attorney Bremer appear and argue Petitioner's appeal. The court denied Attorney Bremer the opportunity that it had provided to every previous counsel.

Petitioner faults Attorney Bremer for not advising Petitioner regarding his right to file a *pro per* supplemental brief. By the time Attorney Bremer became involved, however, that ship had already sailed. The court of appeals had already denied Attorney Young's motion seeking leave to file a late *pro per* supplemental brief months before. Attorney Bremer cannot be faulted for not suggesting to Petitioner that he should ask again.

Essentially, Petitioner blames Attorney Bremer for the difficult situation Petitioner faced. The blame for that situation, however, falls squarely on Petitioner's shoulders for churning through appointed appellate counsel until the Michigan Court of Appeals simply lost patience. The Court can only conclude that Attorney Bremer did not act in a professionally unreasonable manner. Accordingly, Petitioner has failed to demonstrate that Attorney Bremer provided ineffective assistance under *Strickland*.

## V.    Pending Motions

### A.    Motion for Evidentiary Hearing (ECF No. 23)

Petitioner asks the Court to hold an evidentiary hearing regarding the issues raised in his petition. Section 2254 provides:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
>> (A) the claim relies on—

> > (i) a new rule of constitutional law, made retroactive
> > to cases on collateral review by the Supreme Court,
> > that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been
> > previously discovered through the exercise of due
> > diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear
> and convincing evidence that but for constitutional error, no reasonable
> factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e).

Petitioner does not rely on a new rule of constitutional law made retroactive to cases on collateral review. Instead, Petitioner contends that his claims rely on a factual predicate that could not have been previously discovered through the exercise of due diligence. The Court disagrees.

Petitioner's "new" factual predicate is only relevant with regard to (1) his claim that trial counsel was ineffective, or (2) his claim that he is actually innocent. The claim of actual innocence, standing alone, is not cognizable on habeas review. With regard to the ineffective assistance claim, Petitioner was fully aware of Meosha Brown, Jerry Morris, and Richard Young at the time of trial. To the extent those witnesses were not willing to testify then about the facts they are willing to testify about now, counsel cannot be faulted for not presenting them. By Demareo Hodges's and Michael Campbell's own admissions, they were not willing to testify at the time of trial. Trial counsel cannot be faulted for failing to present those witnesses. Accordingly, the Court concludes that Petitioner has failed to meet the requirements of § 2254(e)(2)(A)(ii).

Even if Petitioner could establish his "new" factual predicate, those new facts are neither clear nor convincing. Indeed, the facts would have supported the prosecution's theory of premeditation. The Court finds, for the reasons set forth above, that a reasonable factfinder could have—and likely would have—found Petitioner guilty even with full knowledge of all of the

56

testimony set forth in Petitioner's new affidavits and written statements. Thus, Petitioner has also failed to meet the requirements of § 2254(e)(2)(B).

Petitioner's failure to satisfy the statutory requirements for an evidentiary hearing precludes the relief he requests. *See, e.g.*, *Shinn v. Ramirez*, 596 U.S. 366, 381–82 (2022); *Rogers v. Mays*, 69 F.4th 381, 396–97 (6th Cir. 2023). Accordingly, Petitioner's motion for an evidentiary hearing will be denied.

### B.      Motion to Reinstate Direct Appeal (ECF No. 25)

Petitioner asks the Court to order reinstatement of Petitioner's direct appeal in the Michigan Court of Appeals as a remedy for his claims of ineffective assistance of appellate counsel. As set forth fully above, the Court has concluded that Petitioner has not shown that his appellate counsel rendered ineffective assistance. Accordingly, the remedy is unnecessary and Petitioner's motion to reinstate direct appeal will be denied.

### C.      Counsel's Motion to Withdraw (ECF No. 26)

Petitioner's counsel, pursuant to Local General Civil Rule 2.5 and the Michigan Rules of Professional Conduct, asks this Court for permission to withdraw from representing Petitioner in this matter. Counsel reports that Petitioner insisted that counsel pursue separate Freedom of Information Act litigation, which counsel believed was not advisable. (ECF No. 26, PageID.3819–3820.) When counsel communicated that determination to Petitioner, Petitioner called counsel dishonest, lazy and incompetent. (*Id.*, PageID.3820.) Counsel offers that situation as good cause for her withdrawal. Petitioner confirms that he did call counsel incompetent, lazy and dishonest.

Petitioner apologizes for "any perceived disrespect" and indicates his desire to have counsel continue the representation. Petitioner also asks, if withdrawal is permitted, for the appointment of new counsel.

In considering counsel's and Petitioner's requests, the Court begins by noting that indigent habeas petitioners have no constitutional right to a court-appointed attorney. *Johnson v. Avery*, 393 U.S. 483, 488 (1969); *Barker v. Ohio*, 330 F.2d 594, 594–95 (6th Cir. 1964); *see also Lovado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993). The Court is required by rule to appoint an attorney only if an evidentiary hearing is necessary or if the interest of justice so requires. Rule 8(c), Rules Governing Section 2254 Cases. The Court concludes that neither of those circumstances are present here.

In light of the breakdowns in Petitioner's relationships with his six previous counsel, it is really no surprise that the seventh relationship has broken down as well. It appears that each relationship ultimately fails because Petitioner insists on pursuing a course of action that counsel deems inadvisable. This proceeding is at, or at least near, the end. Counsel has participated in all of the pleading and briefing contemplated by a habeas action under § 2254. The Court does not perceive any significant prejudice that Petitioner will suffer if counsel is permitted to withdraw. Accordingly, the Court will grant counsel's motion to withdraw and deny Petitioner's request for the appointment of substitute counsel.

## VI.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

The Court will enter a judgment dismissing the petition and an order resolving the pending motions and denying a certificate of appealability.

Dated: September 12, 2024                    /s/ Hala Y. Jarbou
                                             HALA Y. JARBOU
                                             CHIEF UNITED STATES DISTRICT JUDGE